Report by Aaron Leatherwood
Powerhouse Marine Consulting

**M/Y Privée invoice analysis 15-June-2020**

Introduction for expert opinion:

Aaron Leatherwood of PH Marine Consulting is a maritime professional specializing in yachts and commercial marine applications. He has extensive domestic and international maritime experience operating and managing private, commercial, military, and government vessels and repair operations. Aaron's 20+ years' experience includes shipyard management, ship and yacht repair, as well as world-wide vessel operations. Aaron is a certified Project Management Professional (PMP) with strengths in contract management, and cost estimating and serves as a US Coast Guard Reserve Officer in maritime safety and security, experienced in regulatory compliance, marine survey and investigations, environmental protection, and spill response. Aaron has extensive experience in custom yacht refit projects and served a member of the Board of Directors for the Marine Industries Association of South Florida and U.S. Superyacht Association.

Summary of findings:

The following expanded invoicing analysis is provided in accordance with Moore & Company and Mr. Cyburt's requests. At this time, I have not received a response from Josh Kerrigan of Yacht Management regarding my request for a project completion quotation. It is understood as per my meeting with Josh and Captain Hector 15-May that only the passerelle installation/commissioning will incur additional cost beyond what has already been estimated and included in the project accounting sheet; and no further charges will be incurred directly related to the in-progress work. I have not received nor am I aware of any quote provided to complete the installation and commissioning of the passerelle. To my knowledge, the completion of the passerelle has been neglected for months without proper financial accounting and without proper cost proposal for the vessel owners' planning, consideration, or approval. At this time, a final quote from Yacht Management for the installation of the passerelle remains outstanding and is still needed with commitment from the yard regarding any further expected costs.

Yacht repair yards typically use three estimating and billing practices:

1. Time and Material (T&M)
2. Estimated (Not to exceed)
3. Firm Price

Time and material tasks transfer the risk to the vessel owner and as such all time keeping and cost documentation is available for review. Labor rates, material mark-ups and vendor management fees will be consistently applied and aligned with industry standards. A firm price task allows the client to better control costs, transferring the risk to the vendor and yard management. Cost documentation for firm price work may be held as business confidential. Firm

1

price tasks should clearly define what is the expected end results including quality and time required. Any/all cost documentation for task other than firm price work should be fully disclosed for client review and discussion.

<u>Dockage/storage, shore power and routine cleaning</u>:

Covered storage has been billed at $3 per foot per day. This is an acceptable short-term daily rate. It is not common industry practice to apply the yard's standard daily rates to long-term projects or to projects where the yard has control of the refit project timeline. It is typical that a greatly reduced space usage (storage) rate is applied to projects of this nature, such that the final rate may be half (or less) of the standard rate. A refit project such as M/Y Privee would, in a many yards, see a flat fee for the space usage such as $15k for an anticipated 3-4-month project. It is noteworthy that according to Captain, and as is routinely negotiated in south Florida repair yards, this yard (Yacht Management) typically does not charge for hard space usage during refit/repair work. Lay days are typically incurred when a project stalls. While it may be argued that some of the project delays are the responsibility of the owner, the fact remains that dockage/space usage fees are far more than standard industry practice. If storage fees can be applied at all, fees should not exceed approximately $3500/month for a vessel of this size and a project of this magnitude.

<u>Vessel general cleaning costs:</u>

Cleanliness of the work areas should be included in the work estimate. It is standard practice to leave the vessel in the same or better condition following the completion of a work task. In many cases initial cleaning may need to be performed to develop a proper baseline and expectation for completed condition. During large refit projects involving multiple trades and contractors this level of cleaning is seldom maintained and additional cleaning efforts are needed to maintain the vessel. It is typical that this additional cleaning effort is provided in part by the vessel crew and in part by the shipyard through unbillable (or reduced billing) unskilled labor. Additional cleaning costs for the Privee project should not exceed 40 hours per month unskilled/reduced labor cleaning fees.

<u>Engine room bilge, and crew space cleaning:</u>

Invoice #18835 indicates 3 persons were needed for 7 days to clean the engine room. The time allotted seems excessive, 4-5 days seems more realistic. This is typically a time and materials (T&M) task that is managed by a supervisor to ensure efficiency and productivity are achieved each day. Time sheets should be available for all T&M work, to verify personnel time keeping. It is typical that the vessel representative will also keep independent time tracking for all T&M work for comparison with the final invoicing.

Bilge cleaning (Inv 18952) applied an additional $4500 to steam clean vessel bilges. The sub-contractor invoice for this should be reviewed to confirm actual cost and appropriate mark-up. Further it needs to be explained why the bilges needed to be steam cleaned if

there would later be repainted. Painting requires sanding and preparation of the surface. Typically steam cleaning is involved when painting is not desired.

An additional $4k was billed for cleaning the crew area not including demolition work. This is a very small area and there is limited surface to clean once all demolished materials are removed. It is estimated this task could be over-charged by 20-30%. Time records should be reviewed to confirm.

<u>Passerelle:</u>

Reference invoices 18953 & 21253. More than 191 man hours are applied to the removal and repair of the passerelle. It is estimated this work could be accomplished for approx 150 man hours including installation. Current invoicing may be more than 30% higher than expected. (Final install quotation has yet to be provided by the yard, and paserelle has yet to be installed, work is incomplete.)

<u>Auxiliary A/C rental:</u>

Auxiliary A/C unit cost is excessive. There are two methods commonly employed to cooling vessel in dry storage, cooling water towers specifically designed for vessels and commercial auxiliary air conditioning units employed in many land-side operations. Where-as the cooling towers are very expensive and last for many years, the auxiliary cooling units are much lower cost, readily available and have a shorter life cycle. It is standard industry practice to have a daily use fee for cooling towers. Likewise, auxiliary A/C units are rented for a day rate on short term projects. On long-term projects where the rental cost will far exceed the replacement cost, rental rates are capped or the unit it purchased for the project to avoid excessive billing. The auxiliary a/c unit used for this project has been invoiced at a daily use rate for the duration of the project well exceeding the replacement and care and maintenance cost of the unit.

<u>Bilge painting, crew quarters and lazarette:</u>

120 man hours (nearly $13k) have been invoiced for painting the limited bilge space in the crew quarters and lazarette. It is estimated these charges are approx 30% more than what should be required. Labor time keeping should be reviewed. Inefficiencies in labor turn-over or lack of skill should be considered such that the client is not over-billed for inadequate project management.

<u>Invoices exceeding estimated values:</u>

There is more than $93k in invoices that exceed the corresponding estimates (approx. 10% of documented estimated project value). Where-as it is not unusual for costs to over-run estimates, in all cases there must be clear communication between the service provider and the client. Clients should be given the opportunity to review and object to all cost over-runs, and any exceeding 10% are expected to be challenged and may not be justified for reimbursement. Costs exceeding the original estimate by 10-15% should be communicated with a separate estimate for approval.

3

Crew quarters demolition, rebuild and plumbing:

Crew quarters work totals nearly $130k. Final invoicing exceeds estimates by more then $23k (18%). Demolition work is excessively charged at $17,500 (Invoice 18952 and 18834). Crew are plumbing for one head (bathroom) and one washing machine exceeded $10k. Crew plumbing is invoiced approx 60% higher than it should be for this limited work. Crew space build-out at nearly $115k is nearly 50% more than expected for this limited amount of work (reference invoice 21485).

Steering system:

Final invoice for steering system repairs (inv19895) exceeds the original estimate by 55%, an increase in cost of more than $13k. There are no further known estimates or correspondence between owner and yard to account for this extreme cost increase.

Electrical wiring and A/V work:

Wiring work exceeded the estimates by nearly 70%. Original electrical wiring estimate (21483) projected $76k in repairs, while the final invoice (20258) totaled more than $128k, as increase of $52k, or 70% without client approval. It is noteworthy that are two conflicting invoices (20258) with a total cost difference of approx. $8k. It is not understood why one version was presented to the client and a different version of the same invoice number has been presented to the Court. It is noteworthy that this invoice was produced in March of 2020 while the work captured to the invoice dates back to August 2019. It is of course highly unusual for a repair yard to delay invoicing for many months and further allow this invoicing to span separate fiscal years. Invoice 20258 should be carefully scrutinized with supporting documentation including all time keeping identifying where there is duplication of effort and/or redundancy in invoicing.

Crew A/C:

Invoice 20246 for the supply and installation of the crew quarters air conditioning is nearly $9k. This invoice includes plumbing and electrical work which has been accounted for in separate plumbing and electrical invoices. $4k in labor and nearly $5k in equipment and materials cost is in excess of what should be required to supply and install one marine air unit for this single small cabin. It is estimated that the crew air system invoicing is approx. 30% greater than what is reasonable to support this work. Note: No estimates were provided for this work. Work performed without estimate and without client approval may not be reimbursed.

Stern Paint Work:

The paint work on the transom, swim platform and garage as presented in invoice 20333 totals nearly $28k. No breakdown of the $20k+ in labor has been provided. The invoice suggests this was a 5-week procedure. It is not reasonable to expect painting of this area of the vessel would require five weeks, accounting for inclement weather, inefficiencies, and re-work. A full break-down of the work performed including labor time keeping

4

records should be provided for review. It is estimated that this task may invoiced approx. 25% greater than what is required. Note: No estimates were provided for this work. Work performed without estimate and without client approval may not be reimbursed.

<u>Underwater Lights:</u>

Invoice 20256 for the supply and installation of replacement underwater lights totals $56k. It is understood that the power supply and control system for the original underwater lights was damaged in the fire. It is not understood why 13 underwater light fixtures required replacement as these were not damaged in the fire. Furthermore, it is not clear why the replacement of these lights would require $9k in labor as there were no new hull penetrations or other major invasive works required. Replacement of only damaged equipment and set-up/programming is estimated to total less than 50% of the invoiced amount. Justification for the cost over-runs and excess replacement equipment is needed. Note: No estimate was provided for this work. Work performed without estimate and without client approval may not be reimbursed.

The above listed items identify more than $300k in unaccounted for, disproportionate and excessive invoicing; more than $90K in work performed without estimate and another $90K+ in costs exceeding estimated values.

5